ORIGINAL

AO 91 (Rev. 11/82)                    **CRIMINAL COMPLAINT**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

FILED
CLERK, U.S. DISTRICT COURT
MAR 1 3 2019
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| UNITED STATES OF AMERICA v. ABRAHAM ARIAS | DOCKET NO. |
| | MAGISTRATE'S CASE NO. **19MJ01030** |

| Complaint for violation of Title 21, United States Code, Section 846 | | |
|---|---|---|

| NAME OF MAGISTRATE JUDGE THE HONORABLE STEVE KIM | UNITED STATES MAGISTRATE JUDGE | LOCATION Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE July 24, 2018 | PLACE OF OFFENSE Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. §§ 846]

Beginning on a date unknown, and continuing until at least on or about July 24, 2018, in Los Angeles County, within the Central District of California, there was an agreement between two or more persons to distribute a controlled substance, namely, methamphetamine, a Schedule II controlled substance. Defendant Abraham ARIAS joined in the agreement knowing of its purpose and intending to help accomplish its purpose.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:  N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT **RICHARD TOVAR** |
|---|---|
| | OFFICIAL TITLE Special Agent – Homeland Security Investigations |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE March 13, 2019 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Benedetto L. Balding x2274          REC: Detention          **STEVE KIM**

## AFFIDAVIT

I, Richard Tovar, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1.     This affidavit is made in support of a criminal complaint against Abraham ARIAS ("ARIAS") for a violation of 21 U.S.C. § 846: Conspiracy to Possess with Intent to Distribute a Controlled Substance.

2.     The facts set forth in this affidavit are based upon my personal observations; my training and experience; and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

### II. BACKGROUND OF SPECIAL AGENT TOVAR

3.     I am a Special Agent ("SA") with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI") and have been so employed since June of 2016.  I am currently assigned to the HSI Los Angeles Regional Aviation Enforcement ("RAVEN") Task Force.  I attended the Criminal Investigator Training Program at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia.  Among other duties, HSI is

responsible for enforcing federal criminal statutes prohibiting the possession and distribution of controlled substances.

4.    Prior to becoming a Special Agent, I was employed by the United States Border Patrol from July 2006 through June 2016, where I attended and completed the United States Border Patrol Training Academy at FLETC in Artesia, New Mexico.  During my time in service with the U.S. Border Patrol, I was assigned to the Las Cruces, New Mexico HSI Border Enforcement Security Task Force and to the Federal Bureau of Investigations Southern New Mexico Safe Streets Task Force.

5.    I have conducted and participated in investigations involving drug trafficking, money laundering, bulk cash smuggling, firearms, alien smuggling, and immigration violations.  During the course of these investigations, I have made numerous arrests and have obtained court orders for GPS tracking, and have obtained arrest, search and seizure warrants.

6.    Through training and participation in numerous criminal and administrative investigations, I have become familiar with and have participated in all the normal methods of investigations, including, but not limited to, surveillance techniques, witness interviews, undercover recordings, electronic monitoring, the use of confidential informants, and the use of undercover agents. Additionally, I have received training specifically with money laundering, asset forfeiture, and seizure as they pertain to narcotics trafficking and money laundering cases.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.    I have been working with HSI RAVEN agents in the Los Angeles area investigating a series of individuals attempting to smuggle narcotics concealed within a false bottom of their checked luggage through the Burbank airport.  This portion of the investigation stems from the arrest of Eric Sammy Pinedo ("Pinedo") who was arrested on July 24, 2018 at the Burbank-Hollywood Airport with approximately 2.8 kilograms of high purity methamphetamine.  Subsequent investigation, including phone records and video surveillance footage show that ARIAS was a co-conspirator with Pinedo in this drug trafficking scheme. ARIAS shopped with Pinedo on the morning of the arrest for items to take in the luggage that was subsequently used to transport the methamphetamine, drove Pinedo in ARIAS's vehicle to the airport, and communicated with Pinedo and another co-conspirator about Pinedo's progress on his trip while Pinedo was at the airport on his way to Phoenix and Hawaii.  The Court previously issued a warrant to search ARIAS's current residence.  On March 12, 2019, I along with other law enforcement executed the warrant and interviewed ARIAS pursuant to a Mirandized interview.  ARIAS confirmed that he was paid to transport luggage from Burbank-Hollywood Airport to Hawaii and return money (which he knew was between $4,000 and $5,000) from Hawaii, and that he recruited Pinedo to participate in this activity to make "easy money."

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

8.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   March 12, 2019 Execution of Search Warrant**

9.   On March 12, 2019, HSI Special Agents executed a search of 1117 Hanover Ave, Los Angeles, California 90022, pursuant to a search warrant obtained on March 11, 2019, believed to be ARIAS's residence.  The search warrant was issued by Hon. Steve Kim on March 11, 2019 in Case No. 2:19-MJ-00963. A copy of that warrant is attached hereto as Exhibit A, and I incorporate by reference my affidavit submitted in support of that search warrant.

10.   On March 12, 2019, upon executing the warrant, HSI Special Agents observed ARIAS exit his residence and walk towards his BMW.  As ARIAS entered the BMW, HSI Agent Thomas Hill and I encountered ARIAS and identified ourselves as law enforcement.

11.   ARIAS raised his hands and stated that he had a pistol in his waistband.  We raised ARIAS's shirt and exposed a pistol with a tan in color lower receiver.  We retrieved the firearm from ARIAS and discovered the firearm to be a 9mm caliber, had a magazine with 16 rounds inserted, and a round in the chamber.  I placed ARIAS in handcuffs for officer safety and the safety of ARIAS.  I told ARIAS he was not under arrest but simply being handcuffed for personal safety reasons.  ARIAS stated he

understood.  I later examined the firearm and noticed that it seemed to lack a brand or serial number.

12.   The search of the residence yielded the following:

a.   ARIAS's California Driver's license YF2452366.

b.   A Wells Fargo Platinum Debit Card in the name of ARIAS.

c.   An .223 caliber EP Armory assault rifle with no serial number, which was found in the living room; a magazine with 24 rounds was inserted in the assault rifle's magazine well.

d.   In the bedroom, agents discovered two pistols in a gun box.  One was a .38 caliber SPL Model 206 revolver.  The second was a 9mm Hi-Point.  Both were unloaded.

e.   Agents also found five empty firearm magazines in the bedroom.  Two of the four belonged to the assault rifle and the other three appeared to belong to a 9mm caliber pistol.

f.   Several documents related to the purchase of the firearms, including National Rifle Association Dealership Application, California Department of Justice Firearms Safety Certificate, a Turner's Firearm Purchase Checklist.

g.   A video surveillance system monitor was found in the living room.  The monitor displayed five different camera angles around ARIAS's residence.

13. HSI Special Agents also searched two automobiles associated with ARIAS, a BMW and an Acura Integra, pursuant to search warrants obtained on March 11, 2019.  No items were seized from the BMW or the Integra.

**B.    ARIAS's Statements**

14.    Also on March 12, 2019, SA Smiley and I conducted a Mirandized interview of ARIAS, in which he told us the following:

      a.    ARIAS built the 9mm handgun found on him and the rifle found in the living room of his house after purchasing the parts on-line.

      b.    ARIAS purchased the two pistols found in the bedroom from a sporting goods store.

      c.    About June of 2018, ARIAS met an unknown individual ("FNU LNU") at a party.

      d.    FNU LNU offered ARIAS $800 to take a luggage to Hawaii and ARIAS would then bring money on his return trip from Hawaii.

      e.    ARIAS was told by FNU LNU all trip expenses would be paid.

      f.    ARIAS provided FNU LNU a picture of his identification card.

      g.    ARIAS was picked up by FNU LNU the morning of his departure to Hawaii.

      h.    FNU LNU provided ARIAS with the piece of luggage he was to transport to Hawaii.

      i.    ARIAS flew out of the Hollywood-Burbank Airport.

      j.    Once in Hawaii, ARIAS was given an address of an apartment where he would stay.

k.   In the apartment, ARIAS was provided a second piece of luggage, which contained approximately $4,000 or $5,000 U.S. dollars.

l.   ARIAS took his personal belongings out of the first piece of luggage he had been provided by FNU LNU and placed them in the second piece of luggage which was provided in the apartment.

m.   ARIAS brought back the second piece of luggage from Hawaii containing the U.S. currency, which he later gave to FNU LNU.

n.   ARIAS was asked by FNU LNU if ARIAS knew other people that wanted to fly (which I understood to mean to transport luggage and return with money from Hawaii).

o.   ARIAS stated he told Pinedo of this opportunity to make easy money as ARIAS knew Pinedo was short on money.

p.   ARIAS was to be paid $200 by FNU LNU for recruiting Pinedo to fly to Hawaii for FNU LNU.

q.   ARIAS admitted he had a Volkswagen Jetta and that it had been repossessed in 2018.

r.   ARIAS stated that on the day of Pinedo's arrest, FNU LNU was constantly reaching out to ARIAS via phone, asking about Pinedo.

s.   After Pinedo's arrest, FNU LNU stopped communicating with ARIAS.

## V.  CONCLUSION

15. For all of the reasons described above, there is probable cause to believe that ARIAS has committed a violation

of 21 U.S.C. § 846: Conspiracy to Possess with Intent to
Distribute a Controlled Substance.

RICHARD TOVAR
Special Agent, Homeland
Security Investigations

Subscribed to and sworn before me
this ____ day of March, 2019.

HON. STEVE KIM
UNITED STATES MAGISTRATE JUDGE

**STEVE KIM**

# EXHIBIT A

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 2:19-MJ-00963 |
| 1117 Hanover Ave., Los Angeles, California 90022 | ) ) ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Controlled Substances |
| 21 U.S.C. § 843(b) | Unlawful use of communications facilities in committing or facilitating a felony drug offense |
| 21 U.S.C. § 846 | Conspiracy to Distribute Controlled Substances |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/

*Applicant's signature*

Richard Tovar, Special Agent, HSI

*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___March 11, 2019___

*Judge's signature*

City and state: _Los Angeles, CA_

Hon. Steve Kim, U.S. Magistrate Judge

*Printed name and title*

AUSA: David Kowal, x5136

## ATTACHMENT A-1

PREMISES TO BE SEARCHED

The premises to be searched is 1117 Hanover Ave., Los Angeles, California 90022.  1117 Hanover Ave., Los Angeles, CA 90022 is a duplex apartment located on the corner of Hanover Ave and E Olympic Blvd in Los Angeles, California.  The exterior of the apartment building is a light brown almost beige color.  When looking at the duplex from Hanover Ave, the subject premise is the apartment unit on the right.  The numbers "1117" are mounted in silver numbers on the front door.  The front door of the apartment faces east along the Hanover Ave side of the property.  There are windows on either side of the front door.  The windows have black security iron bars and the front door has a black security screen door.  The apartment has a detached two car parking garage located on the north side of the building.  There is an awning that appears to connect the two-car garage and the apartment.  When facing the residence there is a red brick planter to the right of the front door and a bush underneath the window to the left of the door.

## ATTACHMENT B

### I. ITEMS TO BE SEIZED

1.    The items to be seized are the evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances), 843(b) (unlawful use of communications facilities in committing or facilitating a felony drug offense); and 846 (conspiracy to distribute controlled substances) (collectively, the "Target Offenses") from the SUBJECT PREMISES, as defined in Attachments A-1 through A-4, namely:

    a.    Documents pertaining to the possession, manufacture, importation, exportation, and/or distribution of controlled substances and illegal proceeds, including invoices, shipping labels, tracking numbers, boxes, and envelopes;

    b.    Drugs and drug paraphernalia, including packaging materials, cutting agents, and manufacturing tools, diluents and other agents used to dilute, or "cut," drugs in order to increase the drugs' volume or weight, including mannitol, mannite, lactose, Vitamin B12, and MSM.

    c.    Equipment used in the packaging and distribution of drugs such as manual and automated pill-press machines, scales, sifters, hammers, grinders, razor blades, glass panes, mirrors and kilo or pound presses, masking agents, tape, heat sealers and heat-sealed bags, Ziplocs bags, hermetically sealed pouches, and/or other containers;

    d.    Books, receipts, notes, ledgers and other forms of records — whether in paper, electronic or other format —

relating to drug distribution activities, including "pay/owe sheets";

       e.   Cash over $2,000, financial instruments, gift cards, precious metals, jewelry, and other items of value that represent either the proceeds from drug sales or signal unexplained wealth, such as real estate, vehicles, and businesses, as well as evidence of the use of digital currency, banks and financial institutions, including evidence of savings and checking accounts, securities, cashier's checks, wire transfers, money orders, money drafts and letters of credit.

       f.   Evidence of the use of the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and money to various points within the United States, such as airbills, empty and/or previously used boxes, packing tape, packing popcorn/filler and other packaging materials, and package tracking records printed from the internet;

       g.   Lists of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses, and email addresses, sometimes encoded and sometimes not encoded, whether stored electronically or on paper;

       h.   Documents relating to travel by air, bus, car, rental car or other means, such as calendars, travel itineraries, maps, airline ticket and baggage stubs, frequent use club membership information and records associated with airlines, rental car companies, and/or hotels, airline, hotel

and rental car receipts, credit card bills and receipts, photographs, videos, passports, and visas;

     i.  Photographs and/or videos of persons, real and personal property, weapons, drugs and other items related to drug trafficking or the proceeds of drug trafficking;

     j.  Items of personal property that tend to identify the person(s) in residence occupancy, control, or ownership of the place being searched vehicle, such as cancelled mail, deeds, leases, titles, registration information, rental agreements, photographs, videos, diaries, utility and telephone bills, tax documentation, travel documents, statements, passports, driver's licenses and/or identification cards, immigration documentation, birth certificates, and keys;

     k.  Keys belonging to and/or evidence of the existence and usage of any lockers, safe deposit boxes, storage facility, vehicle or other property.

     l.  Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

     m.  With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

          i.  evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents,

browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

    ii.   evidence of the presence or absence of
software that would allow others to control the device, such as
viruses, Trojan horses, and other forms of malicious software,
as well as evidence of the presence or absence of security
software designed to detect malicious software;

    iii. evidence of the attachment of other devices;

    iv.   evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

    v.    evidence of the times the device was used;

    vi.   passwords, encryption keys, biometric keys,
and other access devices that may be necessary to access the
device;

    vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

    viii.    records of or information about
Internet Protocol addresses used by the device;

    ix.   records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

## II.   **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.   Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or

seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i. The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

     c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

     d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

     e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

     f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

     g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending),

including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

      h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

    5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

      a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

      b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

      c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

      d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

      e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

      f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.   During the execution of this search warrant, law enforcement is permitted to: (1) depress Abraham ARIAS's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of Abraham ARIAS's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.   In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

7.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, Richard Tovar, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of an application for a warrant to search the following (the "SUBJECT PREMISES"):

a.   1117 Hanover Ave., Los Angeles, California ("the Hanover Ave. Residence"), as described more fully in Attachment A-1; believed to be the residence of Abraham Arias ("ARIAS").

b.   A BMW X5, California license plate no. 7FKH646, Vehicle Identification Number ("VIN") WBXPA93435WD07574, registered to Bedolla Andrew and Bedolla Gitzel, and believed to be operated by Abraham ARIAS (the "BMW"), as described more fully in Attachment A-2;

c.   An Acura Integra, California license plate no. 4UUR414, VIN JH4DC54872C012524, registered to Siu Leanna Pui San, and believed to be operated by Abraham ARIAS (the "Integra"), as described more fully in Attachment A-3, (collectively, the BMW and the Integra are referenced as "the Target Vehicles").

d.   The person of Abraham ARIAS, a Hispanic male with California Drivers' License #F2452366, as described more fully in Attachment A-4.

2.   The affidavit seeks authorization to search the SUBJECT PREMISES for evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances), 843(b) (unlawful use of

1

communications facilities in committing or facilitating a felony drug offense); and 846 (conspiracy to distribute controlled substances) (collectively, the "Target Offenses"), as described herein and in Attachment B of this affidavit. Attachments A-1 through A-4 and Attachment B are fully incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of the investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

4.    I am a Special Agent ("SA") with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI") and have been so employed since June of 2016. I am currently assigned to the HSI Los Angeles Regional Aviation Enforcement ("RAVEN") Task Force. I attended the Criminal Investigator Training Program at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia. Among other duties, HSI is

responsible for enforcing federal criminal statutes prohibiting the possession and distribution of controlled substances.

5.    Prior to becoming a Special Agent, I was employed by the United States Border Patrol from July 2006 through June 2016, where I attended and completed the United States Border Patrol Training Academy at FLETC in Artesia, New Mexico.  During my time in service with the U.S. Border Patrol, I was assigned to the Las Cruces, New Mexico HSI Border Enforcement Security Task Force and to the Federal Bureau of Investigations Southern New Mexico Safe Streets Task Force.

6.    I have conducted and participated in investigations involving drug trafficking, money laundering, bulk cash smuggling, firearms, alien smuggling, and immigration violations.  During the course of these investigations, I have made numerous arrests and have obtained court orders for GPS tracking, and have obtained arrest, search and seizure warrants.

7.    Through training and participation in numerous criminal and administrative investigations, I have become familiar with and have participated in all the normal methods of investigations, including, but not limited to, surveillance techniques, witness interviews, undercover recordings, electronic monitoring, the use of confidential informants, and the use of undercover agents. Additionally, I have received training specifically with money laundering, asset forfeiture, and seizure as they pertain to narcotics trafficking and money laundering cases.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

8.    I have been working with HSI RAVEN agents in the Los Angeles area investigating a series of individuals attempting to smuggle narcotics concealed within a false bottom of their checked luggage through the Burbank airport.  This portion of the investigation stems from the arrest of Eric Sammy Pinedo ("Pinedo") who was arrested on July 24, 2018 at the Burbank-Hollywood Airport with approximately 2.8 kilograms of high purity methamphetamine.  Subsequent investigation, including phone records and video surveillance footage, show that Abraham ARIAS ("ARIAS") was a co-conspirator with Pinedo in this drug trafficking scheme.  ARIAS shopped with Pinedo on the morning of the arrest for items to take in the luggage that was subsequently used to transport the methamphetamine, drove Pinedo in ARIAS's vehicle to the airport, and communicated with Pinedo and another co-conspirator about Pinedo's progress on his trip while Pinedo was at the airport on his way to Phoenix and Hawaii.  There is further probable cause to believe that the Hanover Ave. Residence is ARIAS's current residence, that he uses the Target Vehicles, and that evidence of the Target Offenses will be found in these locations and on his person.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

#### A.    **Arrest of Pinedo on July 24, 2018**

9.    Based on my review of reports, participation in the investigation, and discussion with other agents and law enforcement officers, I know the following about the arrest of

4

Eric Pinedo at the Burbank airport on July 24, 2018 and related events:

      a.   During security screening of Pinedo's checked luggage at Burbank airport on the morning of July 24, 2018, law enforcement officers discovered a bag that contained a false bottom.  Officers used a screw driver to remove a thin wooden cover obscuring the false bottom.  In the false bottom was a package completely wrapped in black electrical tape.

      b.   The checked luggage tag on Pinedo's bag had the name "Eric Sammy Pinedo" and listed American Airlines flights AA 5743 to Phoenix, Arizona and AA 694 to Honolulu, Hawaii.

      c.   Within the package wrapped in electrical tape were two packages containing methamphetamine.  Subsequent laboratory analysis determined that the methamphetamine totaled approximately 2.647 kilograms and was 92.7% pure methamphetamine.

      d.   Pinedo was detained and subsequently arrested at the airport.  At the time of the arrest, officers recovered from Pinedo and took into custody, a silver Samsung cell phone ("the Pinedo Phone").

      e.   Review of video footage from airport cameras shows Pinedo being dropped off at the airport at approximately 7:31 a.m. in a dark four-door Volkswagen sedan, exiting from the rear driver side, taking the bag subsequently found to contain the methamphetamine from the trunk of the sedan and entering the airport.  Video also shows Pinedo walking to the American

Airlines ticket counter where he ultimately checked the bag with an American Airlines representative.

      f.    The day of his arrest, my co-case agent, Steve Smiley, and I conducted a Mirandized interview of Pinedo at the airport.  During the course of the interview, the Pinedo Phone rang revealing a call from "Gencia" as the caller.  When Pinedo saw the screen on the Pinedo Phone ringing he said "that's the number."

**B.    Identification of Arias as a Co-Conspirator**

    10.    Soon after Pinedo's arrest, my co-case agent and I obtained a federal search warrant for the Pinedo Phone. Forensic analysis of the phone pursuant to the search warrant revealed that in addition to communications from what appears to be Pinedo's girlfriend, there are also several SMS and MMS messages (i.e., text messages and picture messages) between Pinedo and phone numbers (562) 396-6278, listed in Pinedo's phone as "Rehab" (and later identified as ARIAS), and (808) 489-5315, listed in Pinedo's phone as "Gencia," regarding the transportation of the narcotics that Pinedo was in possession of when he was arrested.  These communications were exchanged during the time Pinedo was at the airport, as established by the airport video time stamps and the time information in Pinedo's phone.  Pertinent communications included, among others, the following:

    i.    Gencia texted Pinedo "ZLMFZF" and "Conformation #."  Based on the investigation as a whole, I understand that in this communication Gencia provides Pinedo

with the confirmation number for Pinedo's flight from the Burbank-Hollywood Airport to Phoenix and on to Hawaii.

    ii.  Gencia and Pinedo exchange messages about what appears to be the price charged by the airline for checking the bag Pinedo was carrying and in which the methamphetamine was later found. ("How much was your bag" and "The bag 25");

    iii. Gencia texted "What time do you start boarding" and "Alot of ppl there or what" to Pinedo.

    iv.  Pinedo texted ARIAS, "Waiting to board" and a similar message to Gencia ("Yea waiting to board").

    v.  Pinedo sent Gencia a picture of his boarding pass immediately after receiving a text from ARIAS saying, "Send him a pic".

11.  I later obtained subscriber record information from the telephone carrier for (562)396-6278, identified as "Rehab" in the Pinedo Phone. From those records I learned that that phone number was subscribed to Abraham ARIAS, with an address of 5610 Cecilia Street in Bell, CA 90201.

12.  I later obtained toll records for the phone numbers used by ARIAS and Gencia to communicate with Pinedo, at the numbers described above. These records showed that, among other things, ARIAS's phone had communicated with Pinedo's phone 186 times from June 29, 2018 to July 25, 2018. 21 of those communications between ARIAS and Pinedo occurred in the 12 hours immediately preceding Pinedo's arrest. Gencia and Pinedo's phones communicated 43 times on the day of Pinedo's arrest. The phone records also showed that Gencia and ARIAS' phone

communicated 259 times from July 20, 2018 to July 25, 2018, 34 of those communications happened in the 12 hours immediately preceding Pinedo's arrest.

13. In September 2018, I obtained footage from the morning of Pinedo's arrest, July 24, 2018, from a Walmart in Pico Rivera, CA.  My review of the video footage from various locations (at times prior to the time of Pinedo's arrival at the Burbank airport) shows what appears to be the same dark gray, four-door, Volkswagen ("VW") that later dropped off Pinedo at the Burbank airport.  The video also showed, among other things, the following:

a.   The VW entered the Walmart parking lot and backed into a parking space.  An individual can be seen seated in the front passenger seat.

b.   Pinedo exited the vehicle's rear driver's-side door.  The trunk was opened and Pinedo walked to the trunk. Pinedo appeared to take something from the trunk.  He then approached and leaned forward by the driver's door window.

c.   Pinedo walked from the vehicle towards the Walmart front entrance.  The driver, exited the vehicle and ran after Pinedo.

i.   I recognized the driver in this video to be ARIAS from my review of photos of ARIAS that I have reviewed from California DMV records and from later surveillance of ARIAS as part of this investigation.

d.    Pinedo and ARIAS entered the Walmart front entrance and walked across the cashier register banks pushing a cart with new items to fill the suspect luggage.

e.    ARIAS walked into the McDonalds located inside Walmart while talking on a cell phone. Shortly after, Pinedo walked into the McDonalds, carrying a bag of the newly purchased items in one hand and a pillow in the other hand. Pinedo and ARIAS exited the McDonalds, then the Walmart's front entrance and walked back together towards the VW.

f.    As Pinedo and ARIAS approached the VW, the trunk opened and Pinedo and ARIAS walked towards the trunk. A third male, seated in the front passenger seat, exited the vehicle and joined Pinedo and ARIAS at the rear of the VW.

g.    Although the view is partially obstructed, Pinedo can be seen handling the newly purchased items. Before closing the trunk, Pinedo is seen lifting a dark suitcase (which appears to be the bag in which methamphetamine was recovered at the Burbank airport) from the ground and placing it in the trunk. Pinedo, ARIAS and the third male re-entered the VW and drove off.

14.    Reviewing the Walmart video footage, it appears the VW driven by ARIAS does not have a license plate. I know that I subsequently obtained and reviewed California DMV records concerning Abraham ARIAS. From these records, I not only saw photos of Abraham ARIAS that identify him as the driver of the VW with Pinedo on the day of the arrest, but I also learned that ARIAS was the registered owner of a four-door 2016 Volkswagen

Case 2:19-mj-00963-DUTY *SEALED*   Document 3-1 *SEALED*    Filed 03/11/19   Page 21 of 36   Page ID #:89

Jetta (California license plate No. 7UDE729). I believe that this is the same VW seen in the footage at both the Walmart and dropping off Pinedo at the Burbank airport before he was arrested. Additional records that I have reviewed show that ARIAS' VW had been repossessed by Volkswagen Credit in August 2018. Based on my training and experience, I know that drug traffickers often remove the license plates on their vehicles when conducting drug trafficking operations as it creates a layer of protection by concealing their identities from law enforcement.

### C.   Identification of the SUBJECT PREMISES

15.  On multiple occasions between September 2018 and February 2019, I have conducted surveillance at the Hanover Ave. Residence. From these operations, I have learned the following, among other things:

a.   On numerous occasions between September 2018 and February 2019 I saw one or both of the Target Vehicles parked in front of the Hanover Ave. Residence.

b.   On October 29, 2018, I observed ARIAS performing what appeared to be maintenance service on the BMW on the curbside in front of the Hanover Ave. Residence. I observed that the BMW's hood was up and ARIAS was under the BMW's engine compartment.

c.   On October 30, 2018, I observed ARIAS exit the Hanover Ave. Residence, walk around the back towards the alley and entered a garage unit. It appeared that this was the day the street sweeper would pass on the curbside immediately in

front of the Hanover Ave. Residence.  All the vehicles on the street were parked on the curbside opposite the Hanover Ave. Residence.  I later observed ARIAS exit the Hanover Ave. Residence, entered the TARGET VECHICLES which were parked down the street, and repositioned them on the curbside immediately in front of the Hanover Ave. Residence.

     d.   On December 11, 2018, I observed ARIAS depart the Hanover Ave. Residence and drove away in the BMW.

     e.   On January 8, 2019, I observed the Target Vehicles parked on the curbside in front of the SUBJECT PREMISES.

     f.   On February 14, 2019, I observed ARIAS driving the BMW and park the BMW on the curbside in front of the Hanover Ave. Residence.  ARIAS then entered the Hanover Ave. Residence.

     g.   On December 3, 2018, I obtained a federal warrant signed by the Honorable Jacqueline Chooljian, United States Magistrate Judge, authorizing the GPS tracking of ARIAS' phone. From the GPS phone tracking information received and through surveillance efforts, I was able to conclude that ARIAS was in possession of the phone with cellular number (562) 396-6278, the number used to communicate with Pinedo about the methamphetamine transaction.  The GPS phone tracking data also revealed that the phone, possessed by ARIAS, was at the Hanover Ave. Residence during night-time hours.

16.  Based on my review of ownership records, the Integra operated by ARIAS is registered to Siu Leanna Pui San.  It appears that ARIAS may have purchased this vehicle but has not

registered the vehicle in his name.  The BMW driven by ARIAS, is registered to Andrew Bedolla and Gitzel Bedolla.  Through database queries, I believe that Gitzel Bedolla, aka Gitzel Ibarra, is related to ARIAS' girlfriend, Iliana Ibarra.  It is unknown if ARIAS has purchased the vehicle from Andrew and Gitzel Bedolla, or is simply borrowing the vehicle.  However, as noted above, evidence establishes that ARIAS uses the vehicle and keeps it outside his residence, the Hanover Ave. Residence along with the Integra.

17.  Based on my surveillance, the Hanover Ave. Residence is part of a multi-family residential unit.  I have also a checked law enforcement database, which I have found to be reliable in the past.  It indicates that ARIAS is associated with the Hanover Ave. Residence.  The source of this association is information from credit reporting databases Experian and Equifax.  Therefore, it appears the ARIAS is likely using this address for applications that he is submitting for such things as credit cards, car insurance, or utilities.

**D.    Summary and Training and Experience about Use of Houses and Vehicles by Drug Traffickers Like Arias**

18.  In summary, based on the above information and my training and experience, there is probable cause to believe that:

a.   ARIAS was a co-conspirator in the conspiracy with Pinedo and Gencia to possess and distribute approximately 2.647 kilograms of high-quality methamphetamine.

b.    ARIAS used his own vehicle and telephones as part of that drug trafficking activity.

c.    ARIAS currently resides at the Hanover Ave. Residence and uses each of the Target Vehicles.

19.    In addition, the United States Attorney's Office has provided me with the following case law set forth below that supports my experience, and that of other investigators I know, that drug traffickers like ARIAS will commonly store evidence of their illegal activities at their residences and vehicles, such as the SUBJECT PREMISES, and that probable cause exists to search for evidence of drug trafficking at their homes and in their vehicles even when those specific locations have not yet been directly tied to the drug trafficking scheme under investigation:

a.    "[E]vidence discovered by [] officers linking the defendants to a drug scheme provide[s] 'more than a sufficient showing for obtaining the warrant to search [their] ... residence.'" United States v. Fannin, 817 F.2d 1379, 1382 (9th Cir. 1987) (quoting United States v. Peacock, 761 F.2d 1313, 1315 (9th Cir. 1985). "In the case of drug dealers, evidence is likely to be found where the dealers live." United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986) (citing United States v. Valenzuela, 596 F.2d 824, 829 (9th Cir. 1979)); accord United States v. Montoya, 58 F.3d 1414, 1418-19 (9th Cir. 1995). "When the traffickers consist of a ringleader and assistants, a fair probability exists that drugs will be present at the assistants' residence as well as the ringleader's." Angulo-

13

Lopez, 791 F.2d at 1399 (citing United States v. Foster, 711 F.2d 871, 879 (9th Cir. 1983)).

   b. In determining that probable cause exists to search a drug dealer's residence or vehicle which has not otherwise been tied to actual drug trafficking, "a magistrate may rely on the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found." Fannin, 817 at 1382. Accordingly, in United States v. Spearman, 532 F.2d 132, 133 (9th Cir. 1976), the Ninth Circuit upheld a search warrant for the defendant's automobile where the supporting affidavit demonstrated that there was probable cause to believe that the defendant was engaged in drug trafficking generally, and had been seen in the car with a criminal associate, "but there was no specific information that any heroin was ever seen in the automobile," where "the affidavit concluded: 'It is commonplace for dealers of heroin to have heroin that is packaged for sale in the place where they live or sell from, in their vehicles or on their persons'." Id.; accord United States v. Elliot, 322 F.3d 710, 716-17 (9th Cir. 2003) (following Spearman to uphold search of residence); Montoya, 58 F.3d at 1419 (surveillance evidence sufficient to infer that "defendants lived at the residences . . . and that they were involved in the drug trade" established probable cause); United States v. Gann, 722 F.2d 714, 722 (9th Cir. 1984) (search of bank robber's vehicle upheld based on training and experience of agent that various items are stored by bank robbers in vehicles). Similarly, in Fannin, the affiant "relied on past

experience with drug traffickers to conclude that evidence linking Fannin to drug trafficking might be found at Fannin's residence," even though no evidence actually linked Fannin's trafficking to his residence.  Fannin, 817 F.2d at 1381.

**E.   Additional Training and Experience Regarding Drug Trafficking**

20.   Based on my training, experience, and participation in this and other narcotics trafficking investigations and upon my consultation with other experienced law enforcement officers, I know the following information regarding individuals, involved in drug trafficking:

a.   They maintain documents pertaining to the possession, manufacture, importation, exportation, and/or distribution of controlled substances and illegal proceeds, including invoices, shipping labels, tracking numbers, boxes, and envelopes at their residences, stash houses, and/or in their vehicles where they are available for reference and concealed from law enforcement.

b.   They commonly store drugs and drug paraphernalia, including packaging materials, cutting agents, and manufacturing tools in their residences, stash houses, and/or vehicles in order to have ready access to the drugs and/or paraphernalia in order to conduct their drug trafficking business or to use those drugs personally and because they believe these locations are relatively safe.

c.   They keep books, receipts, notes, ledgers and other forms of records specifically relating to their drug

distribution activities.  Because drug traffickers often "front"
drugs to their customers - that is, sell the drugs on credit -
or receive drugs from their suppliers on credit, such
documentation is necessary to keep track of the amounts paid and
owed with respect to their customers and suppliers.  These
ledgers are more commonly known as "pay/owe sheets" and may be
as simple as notations on miscellaneous pieces of paper or may
be recorded more formally in notebooks or even computer
spreadsheets, and are frequently encoded in order to protect
those involved.  Drug traffickers often keep such records on
their person or in their residences, stash houses, and/or
vehicles.

      d.    They commonly keep large sums of currency,
financial instruments, precious metals, jewelry, gift cards, and
other items of value which represent either the proceeds from
drug sales or are intended for the purchase of controlled
substances.  When drug traffickers amass such wealth, they often
attempt to legitimize that wealth or otherwise conceal it and
its origin from discovery by law enforcement.  To accomplish
this, drug traffickers often use different techniques, including
the use of digital currency, foreign and domestic banks and
their attendant services, including savings and checking
accounts, securities, cashier's checks, money drafts and letters
of credit to exchange drug proceeds into money that appears to
come from a legitimate source.  In my training an experience,
amounts of currency (cash) over $2,000 connected to a known drug

Case 2:19-mj-00963-DUTY *SEALED*   Document 3-1 *SEALED*   Filed 03/11/19   Page 28 of 36   Page ID #:96

trafficker, including in their residence and vehicles, are likely to be connected to drug trafficking activities.

      e.   They also purchase real estate or vehicles, and establish shell corporations and business fronts that they use to launder drug proceeds.  Drug traffickers often utilize fictitious or "straw-holder" owners to conceal the true ownership, vehicles, or other valuable items purchased with the proceeds of illicit drug sales.  In addition, drug traffickers often use wire transfers, cashier's checks, and money orders to pay for drugs or other costs relating to their distribution business.  Drug traffickers often keep these items of value, and records relating to them, on their person or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and readily available.

      f.   They go to great lengths to hide and secure the drugs, drug proceeds, other items of value and records relating to their drug business.  This is to safeguard those items against robbery and keep them from law enforcement.  These secure locations typically include safes, vaults, or other locked containers, as well as specially constructed concealed compartments such as those often found in vehicles used specifically to facilitate drug trafficking.  Other methods of concealment include the burial of such items underground, the use of locked vehicles, trailers, out buildings, sheds, and/or exterior closets, the use of natural spaces within walls, furniture, vehicles, and other areas, and the use of sealed cans and canning machines.

     g.    They often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and money to various points within the United States.  They do so, at least in part, due to the convenience of the service and the availability of related internet and phone tracking services, speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another.  They often use hand-written airbills, drop the packages near closing time, pay for such services in cash and utilize false or nominee names, addresses, and/or telephone numbers when using such services in order to further insulate themselves from detection by law enforcement.  Drug traffickers frequently maintain records relating to their use of these services, such as receipts, copies of airbills, empty and/or previously used boxes, packing tape, packing popcorn/filler and other packaging materials, and package tracking records printed from the internet, at their residences, stash houses, and/or in their vehicles where they are available for reference.

     h.    Drug trafficking is an ongoing business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package and deliver the drugs and persons to launder the drug proceeds.  These persons frequently maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses, and email addresses, sometimes encoded and sometimes not encoded, for the purpose of contacting their suppliers, customers, transporters, and others involved in their

illicit drug distribution activities.  These records are typically maintained on their person or in their residences, stash houses, and/or vehicles, so they are readily available in order to efficiently conduct their drug trafficking business. Moreover, such records are often stored electronically within the memory of telephones, computers, and/or personal digital assistants such as iPhone and Blackberry devices.

    i.   They often travel by car, bus, train, or airplane, both domestically and to and/or within foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, or to transport drugs or drug proceeds.  Documents relating to such travel, such as calendars, travel itineraries, maps, airline ticket and baggage stubs, frequent use club membership information and records associated with airlines, rental car companies, and/or hotels, airline, hotel and rental car receipts, credit card bills and receipts, photographs, videos, passports, and visas, are often maintained by drug traffickers in their residences, stash houses, and/or vehicles where they are readily available for use or reference.

    j.   They frequently possess firearms, ammunition, silencers, explosives, incendiary devices, and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take such items and/or harm them during transactions.  Such weapons, which are often stolen or otherwise possessed illegally, are typically maintained on their person or in their residences, stash houses,

and/or vehicles where they are concealed from law enforcement and readily available;

k.   They frequently take, or cause to be taken, photographs and/or videos of themselves, their criminal associates, their real and personal property, their weapons, and their drugs.

l.   They often use electronic devices such as cellular telephones, satellite telephones, pagers and text messaging devices, voicemail or answering machine systems, telephone calling cards, computers, email, and/or personal digital assistants such as iPhone and Blackberry devices in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities by phone, text message, or email.  Drug traffickers often keep the records listed above on those devices.  Drug traffickers often use multiple phones, including not only their own phones but also phones of family members or significant others in order to avoid detection by law enforcement.  Drug traffickers often keep these devices in their residences, stash houses, businesses, and/or vehicles where they are readily available.

## V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

21.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units;

Case 2:19-mj-00963-DUTY *SEALED*   Document 3-1 *SEALED*   Filed 03/11/19   Page 32 of 36   Page ID #:100

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently

---

desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

22.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of

electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

      b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

     23.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

      a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked

for´a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

       c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Arias's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of Arias's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

24.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this digital data by other means.

//

//

//

//

//

## VI. **CONCLUSION**

25.    Based on the above facts, there is probable cause to believe evidence of violations of the Target Offenses as described above and in Attachment B of this affidavit, will be found in a search of the SUBJECT PREMISES, as further described above and in Attachment A-1 through A-4 of this affidavit.

                                            /s/
                                    _____
                                    Richard Tovar, Special Agent
                                    Homeland Security
                                    Investigations

Subscribed to and sworn before me
this  11  day of March 2019.

                                    STEVE KIM
_____
UNITED STATES MAGISTRATE JUDGE

25